# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 4, 2014 Session

## STATE OF TENNESSEE v. MARVIN DAVIS

### Appeal from the Criminal Court for Shelby County
### No. 1106514    J. Robert Carter, Jr., Judge

### No. W2013-00656-CCA-R3-CD  - Filed May 1, 2014

A Shelby County jury convicted the defendant, Marvin Davis, of rape of a child, and the trial court sentenced him to twenty-five years at 100%.  On appeal, the defendant contends that (1) the trial court erred in admitting the videotaped forensic interview of the victim; and (2) the evidence is insufficient to support his conviction.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Stephen C. Bush, District Public Defender; Barry W. Kuhn, Assistant Public Defender (on appeal); and E. Jane Sturdivant and Sanjeev Memula, Assistant Public Defenders (at trial), for the appellant, Marvin Davis.

Robert E. Cooper, Jr., Attorney General & Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Terre Fratesi and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant was indicted on charges of rape of a child and aggravated sexual battery arising out of his sexual encounters with his girlfriend's six-year-old great-niece, between March 18, 2010, and January 22, 2011.

The victim's mother testified that the victim was born on March 18, 2004, and was eight years old at the time of trial. Shortly after the victim was born, the victim's great-aunt, Vurvum Fitzpatrick, began caring for her and continued doing so for approximately five years. The victim viewed Ms. Fitzpatrick and the defendant as her parents and loved both of them. Around the age of six, the victim began spending more time with her mother but continued to stay with Ms. Fitzpatrick and the defendant. The victim's mother said that when the victim stayed with Ms. Fitzpatrick and the defendant, she slept either in the bedroom or on a couch that folded out into a bed.

The victim's mother testified that on January 28, 2011, the victim complained of her stomach hurting and reported that the defendant had "freaked" on her. The victim's mother said the victim had last been to the home of Ms. Fitzpatrick and the defendant on January 21. The victim's mother took her to Le Bonheur Children's Hospital to be examined. They then went to the Memphis Child Advocacy Center where the victim was interviewed and examined.

On cross-examination, the victim's mother testified that after the victim reported the abuse, the victim's mother called Ms. Fitzpatrick, who began screaming and crying upon learning of the allegations. The victim's mother informed Ms. Fitzpatrick of her plans to have the victim examined at Le Bonheur. The victim's mother said that Ms. Fitzpatrick and the defendant met them at Le Bonheur but that the defendant did not say anything about the allegations. The victim's mother acknowledged that she examined the victim before taking her to Le Bonheur and that she did not see any trauma.

The victim testified that although she was living with her mother at the time of trial, she had previously lived with Ms. Fitzpatrick in an apartment for a long period of time. The victim, Ms. Fitzpatrick, and the defendant slept in the same room. Ms. Fitzpatrick and the defendant slept on a portion of the couch that folded out into a bed while the victim slept on the other portion of the couch.

The victim recalled one occasion when the defendant woke her up, carried her upstairs, took off her pants, and put his "middle part" in her "behind" and into her vagina. The victim said the defendant's "middle part" was located above his knees and below his waist and was used to urinate. She stated that the defendant told her not to tell anyone and then carried her back downstairs where Ms. Fitzpatrick was sleeping. The victim further stated that she was six years old at the time.

The victim testified that during a separate incident, the defendant again woke her up, carried her upstairs, took her clothes off, put his "middle part" in her "behind" and into her vagina, and carried her back downstairs where Ms. Fitzpatrick was sleeping. The victim said

the defendant's "middle part" went into her vagina. When she returned to her mother's home, her stomach began hurting, and she informed her mother of the defendant's actions. The victim's mother took her to a children's hospital where she was examined. The victim said she then went to another building where she told someone that the defendant had touched her.

On cross-examination, the victim testified that both assaults occurred the same way. She said she first reported the abuse to Ms. Fitzpatrick, who did not respond. The victim then waited some time before telling her mother.

Dr. Karen Larkin, an assistant professor of pediatrics and the medical director for the child assessment program at Le Bonheur Children's Hospital, was admitted by the trial court as an expert in "child abuse pediatrics." Dr. Larkin examined the victim in the Le Bonheur Clinic at the Memphis Child Advocacy Center on February 1, 2011. She recalled that the victim was six years old at the time of the examination.

Dr. Larkin testified that she interviewed the victim alone after introducing herself and speaking to the victim's mother. The victim told Dr. Larkin that she had been brought to the clinic because her aunt's boyfriend had "freaked" on her. The victim reported having pain during the assault but said she did not have any pain at the time of the examination.

Dr. Larkin said that although the victim did not tell her when the assault occurred, children around the victim's age generally do not understand the concept of time. Dr. Larkin generally obtained such information from the child's parents. The victim's mother told Dr. Larkin that the assault occurred on January 21, 2011. Dr. Larkin explained that no DNA evidence was obtained due to the difficulty in obtaining such evidence forty-eight to seventy-two hours following a sexual assault.

During the physical examination, Dr. Larkin noted a deep cleft or notch on the victim's hymen. She explained that this finding did not mean that something did or did not occur. Rather, the cleft can be a normal variant in both children and adolescents. Dr. Larkin said the cleft also could be the result of healing from a tear and could support sexual assault. Because she could not make a definite finding as to whether the cleft was the result of sexual assault, her finding was "indeterminate." Dr. Larkin noted that more than 95% of sexual assault victims do not have physical injuries.

On cross-examination, Dr. Larkin testified that she concluded that indeterminate findings from the physical examination may support the victim's disclosure of abuse. Dr. Larkin said that she found no evidence of penetration but that a child can be sexually penetrated without physical injury. She further said the victim and her mother reported only

one incident of sexual assault.

Patricia Lewis, a forensic interviewer with the Memphis Child Advocacy Center, was accepted by the trial court as an expert in forensic interviewing. Ms. Lewis testified that she conducted a forensic interview of the victim on January 28, 2011, at 1:30 p.m. Only the victim and Ms. Lewis were in the room during the interview.

Ms. Lewis said the victim was cooperative and seemed nervous. At one point, the victim mentioned that her stomach was hurting. Ms. Lewis stated that the victim was a typical six-year-old child who demonstrated appropriate verbal skills and appropriate knowledge of body parts for her age level. The videotape and transcript of the interview were entered into evidence.

During the interview, the victim informed Ms. Lewis that the defendant touched her "coochie" and her "butt" with his "middle part" on one occasion while on the couch and on one occasion while upstairs. The victim said the defendant told her not to tell anyone. She also said that during the assault that occurred upstairs, the defendant was "inside" her "coochie." Following Ms. Lewis' testimony, the State rested.

The defense presented the testimony of Vurvum Fitzpatrick, who testified that at the time of trial, she and the defendant had been dating for approximately eight years. She said the victim came to live with her and the defendant after the victim's mother planned to put her up for adoption. Ms. Fitzpatrick begged the victim's mother not to do so and agreed to care for the victim. The victim began living with Ms. Fitzpatrick when the victim was three weeks old. Ms. Fitzpatrick said that as the victim got older, her mother tried to use the victim to control Ms. Fitzpatrick.

Ms. Fitzpatrick testified that she and the defendant slept in the living room on a sectional that folded out into a bed. The victim slept on the couch portion of the section. Ms. Fitzpatrick said they slept in the living room downstairs rather than the bedroom upstairs because she did not want to walk up and down the stairs often. She stated that the apartment was located in an unsafe neighborhood. She explained that she was a light sleeper because she was not comfortable with the neighborhood and woke up if the defendant got out of bed.

Ms. Fitzpatrick denied that the victim told her that the defendant had touched her inappropriately. Rather, she said the victim's mother called and told her. Ms. Fitzpatrick began crying and became so "hysterical" that the defendant took the telephone. Ms. Fitzpatrick said she and the defendant accompanied the victim to Le Bonheur. She also said the defendant was aware of the accusations and wanted to assist in any way that he could.

-4-

Ms. Fitzpatrick denied ever seeing the defendant act inappropriately toward the victim or any other children.

At the conclusion of the proof, the State dismissed the charge of aggravated sexual battery. The State then elected to rely upon the alleged vaginal penetration occurring during the second incident upstairs as a basis for the child rape charge. The jury convicted the defendant of child rape, and the trial court sentenced the defendant to twenty-five years to be served at 100%. This appeal followed.

## ANALYSIS

The defendant contends that (1) the trial court erred in admitting the videotaped forensic interview of the victim; and (2) the evidence is insufficient to support his conviction.

### I. Admission of the Videotaped Forensic Interview

The defendant asserts that the trial court erred in admitting the video recording of the victim's forensic interview pursuant to Tennessee Code Annotated section 24-7-123. This section provides for the admissibility of the video recording of a forensic interview of a child under the age of thirteen during which the child described any act of sexual contact performed on or with the child if certain requirements are met. Tenn. Code Ann. § 24-7-123(a). The video recording "may" be admitted if:

> (1) The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination;
>
> (2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pre-trial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:
>
>> (A) The mental and physical age and maturity of the child;
>>
>> (B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;
>>
>> (C) The timing of the child's statement;
>>
>> (D) The nature and duration of the alleged abuse;

(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court;

(3) The interview was conducted by a forensic interviewer who met the following qualifications at the time the video recording was made, as determined by the court:

(A) Was employed by a child advocacy center that meets the requirements of § 9-4-213(a) or (b);

(B) Had graduated from an accredited college or university with a bachelor's degree in a field related to social service, education, criminal justice, nursing, psychology or other similar profession;

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:

(i) Child protective services;

(ii) Criminal justice;

-6-

(iii) Clinical evaluation;

(iv) Counseling; or

(v) Forensic interviewing or other comparable
work with children;

(D) Had completed a minimum of forty (40) hours of forensic
training in interviewing traumatized children and fifteen (15)
hours of continuing education annually;

(E) Had completed a minimum of eight (8) hours of
interviewing under the supervision of a qualified forensic
interviewer of children;

(F) Had knowledge of child development through coursework,
professional training or experience;

(G) Had no criminal history as determined through a criminal
records background check; and

(H) Had actively participated in peer review;

(4) The recording is both visual and oral and is recorded on film or videotape
or by other similar audio-visual means;

(5) The entire interview of the child was recorded on the video recording and
the video recording is unaltered and accurately reflects the interview of the
child; and

(6) Every voice heard on the video recording is properly identified as
determined by the court.

Tenn. Code Ann. § 24-7-123(b).

In the present case, an evidentiary hearing was held prior to trial during which
multiple witness, including the victim, testified. At the conclusion of the hearing, the trial
court found that the requirements of subsection (b) had been satisfied and allowed the State
to present the video recording at trial.

The defendant does not contend that the requirements in subsection (b) were not met. Rather, the defendant challenges the constitutionality of Tennessee Code Annotated section 24-7-123. The defendant contends that the statute violates a defendant's right to confront witnesses, the separation of powers doctrine, a defendant's right to a jury trial and the presumption of innocence, and his due process rights.

The defendant did not raise the constitutionality of the statute in the trial court. Our supreme court has held that "questions not raised in the trial court will not be entertained on appeal and this rule applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion." Lawrence v. Stanford, 655 S.W.2d 927, 929 (Tenn. 1983) (citations omitted). The failure to present a constitutional challenge in the trial court deprives the court of the opportunity "for the introduction of evidence which might be material and pertinent in considering the validity of the statute." Id. The defendant also failed to raise the issue in its motion for new trial. Accordingly, this issue is waived. See Tenn. R. App. P. 3(e), 36(a); Lawrence, 655 S.W.2d at 929-30.

The defendant requests that this court review the issue under the plain error rule. In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

It is well-established in Tennessee that when considering the constitutionality of a statute, we must start with a strong presumption that acts passed by the legislature are constitutional. See Osborn v. Marr, 127 S.W.3d 737, 740-41 (Tenn. 2004). We must "indulge every presumption and resolve every doubt in favor of constitutionality." Vogel v. Wells Fargo Guard Servs., 937 S.W.2d 856, 858 (Tenn. 1996). A party challenging the constitutionality of a statute may challenge the statute as unconstitutional on its face or unconstitutional as applied to that party's case. It is well recognized that a facial challenge to a statute, is "'the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exist under which the Act would be valid.'" Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 525 (Tenn. 1993) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)).

## A. Confrontation Clause

The defendant asserts that Tennessee Code Annotated section 24-7-123 is unconstitutional on its face because it violates the Confrontation Clause in the United States and Tennessee Constitutions. Interpreting the Sixth Amendment, the United States Supreme Court noted in Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004), that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." The Confrontation Clause "does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." Id. Our supreme court has reached the same conclusion under article I, section 9 of the Tennessee Constitution. State v. Banks, 271 S.W.3d 90, 118-19 (Tenn. 2008).

In order for the video recording to be admitted pursuant to section 24-7-123, the child must testify, "under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination." Tenn. Code Ann. § 24-7-123(b)(1). This subsection, however, does not specify whether the child must testify at trial. Nevertheless, circumstances exist under which the statute does not violate an accused's right to confront witnesses. The right to confrontation of witnesses is not violated by the admission of a video recording of the forensic interview when the child testifies at trial and is subject to cross-examination by the defendant "face to face," which is what occurred in the present case. Because the statute does not violate an accused's right to confront witnesses on its face or as applied to the defendant's case, a clear and unequivocal rule of law was not breached.

## B. Separation of Powers

The defendant next asserts that section 24-7-123 violates the separation of powers doctrine. According to the defendant, the video recording of the interview constitutes hearsay, and the General Assembly does not have the authority to create exceptions to the hearsay rule.

Article II, section 1 of the Tennessee Constitution provides, "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Article II, section 2 further provides, "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." While no precise lines of demarcation in the respective roles of our three branches of government exist, the traditional rule is that "the legislative [branch] [ha]s the authority to make, order, and repeal [the laws], the executive . . . to administer and enforce, and the judicial . . . to interpret and apply." Underwood v. State, 529 S.W.2d 45, 47 (Tenn. 1975) (citation omitted).

Only the Tennessee Supreme Court has the authority to oversee the practice and procedure in Tennessee's courts. Bush v. State, __ S.W.3d __, 2014 WL 295187 (Tenn. 2014). However, "'[a] legislative enactment which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible encroachment upon the judicial branch of government.'" Lynch v. City of Jellico, 205 S.W.3d 384, 393 (Tenn. 2006) (quoting Underwood, 529 S.W.2d at 47).

In State v. Mallard, 40 S.W.3d 473, 479 (Tenn. 2001), our supreme court addressed Tennessee Code Annotated section 39-17-424 (1997), which set forth several factors for courts to consider "in addition to all other logically relevant factors" in determining whether an object was drug paraphernalia. One of the factors, "[p]rior convictions, if any, of the owner or of anyone in control of the object for violation of any state or federal law relating to controlled substances," conflicted with Tennessee Rule of Evidence 404(b), which generally precludes the admission of evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait." See Mallard, 40 S.W.3d at 479-80.

Our supreme court noted that the judicial branch will consent to rules of procedure or evidence that are promulgated by the legislature only when they "(1) are reasonable and workable within the framework [of] the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court." Id. at 481. The court stated that it will consent "purely out of considerations of inter-branch comity" and that to hold otherwise "would be to irreparably damage the division of governmental power so essential to the proper maintenance of our constitutional republic." Id. at 482. Our supreme court further explained:

> [T]he legislature can have no constitutional authority to enact rules, either of evidence or otherwise, that strike at the very heart of a court's exercise of judicial power. Among these inherent judicial powers are the powers to hear facts, to decide the issues of fact made by the pleadings, and to decide the questions of law involved. As an essential corollary to these principles, any determination of what evidence is *relevant*, either logically or legally, to a fact at issue in litigation is a power that is entrusted solely to the care and exercise of the judiciary. Indeed, a "court's constitutional function to independently decide controversies is impaired if it must depend on, or is limited by, another branch of government in determining and evaluating the facts of the controversies it must adjudicate." Consequently, any legislative enactment that purports to remove the discretion of a trial judge in making determinations of logical or legal relevancy impairs the independent operation of the judicial branch of government, and no such measure can be permitted to stand.

-10-

Id. at 483 (citations omitted) (quoting Opinion of the Justices, 688 A.2d 1006, 1016 (N.H. 1997)). Respectful of the presumptive constitutionality of all legislative acts, the court interpreted the statute as supplemental and held that the statute applied so long as the evidence otherwise met the requirements for admissibility under the Rules of Evidence. Id. at 484. Since Mallard, our supreme court has noted that "when it comes to Tennessee's courts, our commitment to cooperation among the three branches of government has prompted us to acquiesce in and to apply statutes affecting the operation of the courts when they do not interfere with the courts' adjudicative functions or otherwise impermissibly encroach on the Judicial Branch." Bush, __ S.W.3d at __, 2014 WL 295187, at *11.

In the present case, the defendant argues that the admission of the video recording of a forensic interview pursuant to Tennessee Code Annotated section 24-7-123 would violate the "hearsay rule." Tennessee Rule of Evidence 802 provides that "[h]earsay is not admissible except as provided by these rules *or otherwise by law*." Tenn. R. Evid. 802 (emphasis added). The last phrase suggests that hearsay exceptions created by statute do not necessarily conflict with Rule 802.

The rationale supporting recognition of the various exceptions to the hearsay rule is to "admit only hearsay evidence that exhibits inherent trustworthiness and indicia of reliability." Arias v. Duro Standard Prods. Co., 303 S.W.3d 256, 263 (Tenn. 2010). The State argues that while a legislative-crafted hearsay exception that eliminates a judicial determination of reliability might be susceptible to a challenge based upon the separation of powers doctrine, section 24-7-123 does not dispense with a judicial determination of reliability. We agree. Section 24-7-123(b)(2) requires that a trial court determine that the recording "possess[es] particularized guarantees of trustworthiness" before admitting it into evidence. The statute lists several factors for the trial court to consider in making this determination, including "[a]ny other factor deemed appropriate." Tenn. Code Ann. § 24-7-123(b)(2)(K).

Finally, section 24-7-123 does not "remove the discretion of a trial judge in making determinations of logical or legal relevancy." Mallard, 40 S.W.3d at 483. Rather, the statute provides that a recording of a forensic interview "*may* be considered for its bearing on any matter to which it is relevant. . . ." Tenn. Code Ann. § 24-7-123(a) (emphasis added). A trial court may exclude a recording if it finds that it is not relevant to the issues at trial. Moreover, even if the video recording satisfies the statutory prerequisites in section 24-7-123, the trial court is afforded the discretion to determine that the recording is nevertheless inadmissible. See Tenn. Code Ann. § 24-7-123(b) (providing that the "video recording may be admitted"); State v. Barry D. McCoy, No. M2011-02121-CCA-R9-CD, 2012 WL 1941775, at *4 (Tenn. Crim. App. May 30, 2012), perm. app. denied (Tenn. Sept. 19, 2012). Thus, for example, the trial court may exclude the recording pursuant to Tennessee Rule of Evidence 403 upon

-11-

finding that the probative value of the recording is "substantially outweighed by the danger of unfair prejudice."

Section 24-7-123 does not "strike at the very heart of a court's exercise of judicial power." Mallard, 40 S.W.3d at 483. Therefore, the defendant has failed to show that the statute violates the separation of powers doctrine. Accordingly, a clear and unequivocal rule of law was not breached by the admission of the video recording, and the requirements for plain error were not met.

## C. Trial by Jury and Presumption of Innocence

The defendant next argues that section 24-7-123 violates an accused's constitutional rights to a jury trial and the presumption of innocence. The defendant acknowledges that he did not find any cases addressing this issue. We likewise have found no authority supporting the defendant's claim. Accordingly, the defendant has failed to establish that a "clear and unequivocal" rule was breached and that the admission of the recording rose to the level of plain error.

## D. Due Process

Finally, the defendant asserts that the admission of the recording of the victim's forensic interview in this case violated his due process rights. While the defendant cites to authority regarding the general principles of due process, the defendant has failed to cite to any authority addressing this specific issue. Accordingly, the defendant has failed to establish that a "clear and unequivocal" rule was breached and that the admission of the recording rose to the level of plain error.

## II. Sufficiency of the Evidence

The defendant contends that the evidence presented at trial is insufficient to support his conviction for rape of a child. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or

a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, or any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The State presented evidence of more than one sexual assault and sought a conviction for the second instance of vaginal penetration which occurred upstairs. The victim, who was six years old at the time of the rape, testified that the defendant took her to an upstairs bedroom and penetrated her anally and vaginally with his penis. During the forensic interview, the victim said that during the second assault, the defendant's penis was "inside" her vagina. Both the victim's mother and Dr. Larkin testified that the victim reported to them that the defendant had "freaked" on her.

The defendant argues that the evidence is insufficient due to the lack of DNA evidence and physical evidence of sexual penetration. However, Dr. Larkin explained that no DNA evidence was obtained because of the length of time between the rape and her examination of the victim. While Dr. Larkin could not determine whether the cleft or notch on the victim's hymen was the result of sexual penetration, Dr. Larkin testified that more than 95% of sexual assault victims do not have physical injuries and that a child can be sexually penetrated without physical injury. When viewed in a light most favorable to the State, we conclude that the evidence is sufficient to support the defendant's conviction for rape of a child.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.


_____
ALAN E. GLENN, JUDGE